UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TAMARA THAYER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LINCOLN FINANCIAL GROUP, )<br>)<br>Defendant. ) | Cause No. 1:20-CV-284-HAB |

**OPINION AND ORDER**

Plaintiff was a white-collar worker, plying her trade at a desk, seated in front of a computer monitor. This arrangement worked for nearly forty years, until medical issues left Plaintiff unable to use a keyboard and mouse. Defendant (well, not actually Defendant, but more on that later) tried to accommodate Plaintiff's restrictions by offering the use of dictation software and a headset which, used together, would obviate the need for a keyboard and mouse. Plaintiff responded that the only acceptable accommodation was a new position. The parties at a loggerhead, Plaintiff refused to appear for work and was deemed to have resigned by her employer.

Plaintiff sued under the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). Defendant now moves for summary judgment. The motion has been fully briefed (*see* ECF Nos. 14, 23, 25) and is ripe for a decision.

**I.  Factual Background**

Plaintiff started working at Lincoln National Life Insurance Company ("LNL") in 1976. She worked more or less continuously with the company until 2019, serving in various positions and departments. Beginning in 2006, she worked as an auditor in the Quality Assurance

Department. Auditors in that department were assigned to audit one of many product lines, including product enrollments, plan setups, money in, and money out.

The record shows that Plaintiff was not the model of health. As early as January 2015, Plaintiff was told by her family doctor, Thomas Kintanar, M.D., that she should not work more than eight hours per day. This was because of high blood pressure and swelling in Plaintiff's hands and feet. In March 2017, Plaintiff formally requested that she not work overtime as an accommodation to address her health issues. This request was at first denied because her position did not require overtime.

That situation changed in May 2017 when Plaintiff was informed that overtime would be required. At LNL's request, Plaintiff submitted a LNL form filled out by Dr. Kintanar. The thrust of Dr. Kintanar's opinion was that Plaintiff needed "finite work hours in order to keep [her] edema [down]." (ECF No. 14-1 at 104). Dr. Kintanar's ultimate opinion was that Plaintiff could not work more than eight hours per day. After reviewing Dr. Kintanar's opinion, LNL offered to accommodate Plaintiff reducing the amount of overtime Plaintiff had to work. If overtime was required, Plaintiff could adjust her next day's schedule to account for the overtime hours. Plaintiff accepted this accommodation.

Everything was hunky dory until June 2018 when LNL reorganized Plaintiff's department. LNL eliminated some positions, added positions, and reallocated job duties as part of the restructuring. The reorganization affected Plaintiff and every other auditor. Some duties of her position were transferred to other positions while new duties were added. These new duties included "advanced Microsoft Excel skills and the use of pivot tables," skills LNL asserts Plaintiff did not have. Plaintiff scoffs at the idea that she lacked Excel skills, but concedes that she was only "generally aware of how Pivot Tables worked." (ECF No. 24 at 5).

2

LNL's solution to Plaintiff's skills gap was to "promote" her to the newly created position of Senior Servicing Representative and to move a younger employee into her old position. Plaintiff's new position required her to audit money out for LNL's Alliance product. The auditing in the new position was "quicker" in that each audit took only a few minutes, while audits in Plaintiff's previous position took about an hour. As a result, Plaintiff had to use her keyboard and mouse more often. The new position also required overtime because each audit needed to be completed the same day. Plaintiff began cross-training for the new position in May 2018. She incurred some overtime during the training, although it does not appear that her new supervisor was aware of her overtime accommodation.

Plaintiff's start date for the new position was June 25, 2018, but she was on vacation that week. During her vacation, Plaintiff visited Dr. Kintanar to complain about the requirements of the new position. Dr. Kintanar provided Plaintiff a note that said, in part:

> [Plaintiff] may return to work with the following restrictions: it is highly recommended that she be moved back to her old position to improve her pain and be able to perform at optimum level when working. [Plaintiff] is also unable to work overtime. All of this is due to a mass in her right anterior arm that has become inflamed due to the activities of the new position.

(ECF No. 14-1 at 118). Plaintiff provided this note to Stacey Jester ("Jester"), an HR Consultant, on July 2, 2018. Jester told Plaintiff that she (Plaintiff) would need to complete an accommodation form. Plaintiff completed the form and returned it to Jester on July 5, 2018. Plaintiff's suggested accommodation was a "job where I am not constantly on the keyboard – no overtime." (ECF No. 14-2 at 2).

The week of July 2, 2018, was the only week that Plaintiff worked the new position. This was a four-day work week because of the July 4th holiday. Plaintiff worked 7.25 hours of overtime during this week. The next week, Plaintiff began another vacation. During this vacation Plaintiff

again visited Dr. Kintanar, who placed Plaintiff on a no-work restriction until late-September 2018. LNL approved this leave of absence, and Plaintiff received short term disability benefits while on leave.

The day before she was to return from leave, Plaintiff obtained another work restriction from Dr. Kintanar. This restriction stated, "[m]ay return to work with limitation, patient is permanently disabled from her previous condition[1]. She is not to use a keyboard and mouse based on PT assessment and recommendations." (ECF No. 14-2 at 18). Plaintiff informed Jester of the new restriction, and Plaintiff was again asked to complete an accommodation form. This new form requested a "position where I am not using the mouse and keyboard constantly." (*Id*. at 30).

In response to the latest accommodation form, Jester asked Plaintiff to have Dr. Kintanar complete a medical documentation form. The completed form is case study in illegible physician handwriting. That said, the gist of Dr. Kintanar's opinion appears to be that Plaintiff cannot perform her new position because of the requirement for "repetitive motions with both hands." Dr. Kintanar continued to conclude that Plaintiff not work more than eight hours in a row. (*Id*. 31–34).

Even while the nature of Plaintiff's restrictions was evolving, LNL started identifying a way Plaintiff could perform her job. In early September 2018, Cathy McDonald, LNL's Vocational Rehabilitation Consultant, contacted Plaintiff to discuss devices that might assist Plaintiff. These included devices that allowed Plaintiff to operate the keyboard and mouse via eye movement or speech into a straw-like device. Plaintiff's communication with McDonald ended, however, after Dr. Kintanar permanently disabled her from the new position.

At the beginning of January 2019, Jester sent Plaintiff a letter addressing Plaintiff's need for accommodation. That letter stated, in relevant part:

---

[1] The parties agree that "condition" was a typo, and that Dr. Kintanar intended to write "position."

> You stated that you are not permanently disabled from all work- just from your current position. Tamara, as you know, we have offered you a head set that would allow you to control the mouse and keyboard by turning your head rather than repetitive clicking of the mouse. You summarily discounted the headset and said did not think that the head set would work. Tamara, as we review your medical documentation as provided by your physician, there is no medical basis upon which you are rejecting this offered accommodation. Your doctor indicated that your only limitation was performing repetitive motions with both hands in your current working situation. When asked if there was any other equipment that would help, you did not think that there was any equipment that would help you return to your current position.
>
> Tamara, as we explore our open roles, there are no positions that would not require repetitive hand motions. Therefore, we are offering you the opportunity to return to work in your current role with the headset as an accommodation to the repetitive hand motion. We look forward to your return to work on January 14, 2019 at 8:00 am.

(*Id*. at 36).

Plaintiff responded via email the next day. In her email, Plaintiff rejected the use of the headset, stating that she "didn't believe that any devices would suffice with the production standards which are needed for this position." (*Id*. at 38). In fact, Plaintiff rejected any accommodation that would require her to work her new position, stating, "[t]he fact remains that I have **not** been released by my doctor to go back to this position and his Medical Documentation Forms are quite clear that I am permanently on disability from this position." (*Id*. at 39). After threatening LNL with further legal action, Plaintiff closed her email by stating:

> So, I will restate this again – my doctor has not released me to go back to this position – refer to the Medical Documentation Request Form – the accommodation is another position. So, if you cannot accommodate me then, I expect my Short Term disability benefits to be paid.
>
> I will **not** be back to work in this position on January 14, 2019 as that is **not** the accommodation.

(*Id*.).

Jester responded via letter two days letter. Her letter: (1) reiterated LNL's belief that its hardware and software solution accommodated her restrictions; (2) assured Plaintiff that LNL would allow her a period to adjust to the accommodation and ramp up her productivity; (3) communicated that LNL would honor her request not to work more than eight hours in a day; and

5

(4) informed Plaintiff that there were no available positions with LNL that did not require the use of a mouse or keyboard. (*Id*. at 40–41). At the end of the letter, Jester advised that LNL would expect Plaintiff to return to work by January 28, 2019.

Jester's letter prompted a call from Plaintiff. During the call, Plaintiff posed several questions that Jester could not answer, including specifics about the proposed headset and the status of Plaintiff's position. The next day, Jester emailed Plaintiff to advise that Plaintiff would be returning to the Senior Servicing Representative position. Jester also advised that LNL would need Plaintiff's doctor to release her back to work. If Plaintiff's doctor would not release her back to work, LNL would require another medical certification explaining why the headset would not address Plaintiff's restrictions. Jester requested the medical certification by February 11, 2019.

What followed was an email exchange addressing several topics. Plaintiff stated that she was not scheduled to see Dr. Kintanar until February 14, 2019, and Jester asked if she could find an earlier appointment. Plaintiff asked for the make and model of the headset, which Jester provided. Finally, Plaintiff confirmed that she could not get into Dr. Kintanar's office before February 14, 2019; Jester responded by reiterating LNL's need for the medical certification.

Some three weeks later, Jester informed Plaintiff via letter that LNL found her to have resigned her position since no medical documentation had been provided and Plaintiff had not returned to work. Plaintiff responded, stating that she had not resigned and that she was still waiting on the documentation from Dr. Kintanar. Jester replied that LNL considered the matter closed.

Despite this exchange, Plaintiff emailed Jester the medical documentation the next day. Dr. Kintanar again concluded that Plaintiff could not use a keyboard or mouse. He stated that the required accommodation was a "position that does not require use of keyboard or mouse or sitting in one position for extended period. (*Id*. at 47).

**II.     Legal Analysis**

**A.      *Summary Judgment Standard***

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

**B.      *Plaintiff has not Sued her Employer***

Before reaching the merits of Plaintiff's claims, the Court must first address the entity Plaintiff has sued. As it has since its Notice of Removal, LNL pointed out in its summary judgment

7

brief that it, not Defendant, was Plaintiff's employer. Plaintiff, in her summary judgment response, agreed. She states, "[a]s a matter of housekeeping, the correct Defendant is 'The Lincoln National Life Insurance Company' – as set forth in the introductory paragraph of Defendant's Answer. Thayer requests that the Court reflect the proper name of the Defendant by way of interlineation." (ECF No. 23 at 1). The Court finds Plaintiff's decision to continue suit against a non-liable entity for more than a year to be far more serious that Plaintiff's flippant response would suggest.

Suing your employer in an employment discrimination case is not a housekeeping matter. The ADA prohibits discrimination and retaliation by employers. *See* 42 U.S.C. § 12111; *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012); *Christner v. American Eagle Airlines, Inc.*, 2003 WL 21267105, at *3 (N.D. Ill. May 30, 2003). So, too, does the ADEA. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361 (1995). Part and parcel to such claims, then, is naming one's employer as the defendant. When an employee fails to name her employer, the appropriate consequence is the entry of summary judgment for the non-employer entity. *Pitts v. Elkhart Cnty.*, 2007 WL 3256663 (N.D. Ind. Nov. 2, 2007).

Plaintiff's solution, having the Court shoehorn LNL into the caption, doesn't fix the problem. Amendment by interlineation goes against the local rule on amendment. *Hentea v. Trs. of Purdue Univ.*, 2005 WL 8170119, *1 (N.D. Ind. Aug. 25, 2005). N.D. Ind. L.R. 15-1(b) requires amendments to "reproduce the entire pleading as amended" and states that the amendment "must not incorporate another pleading by reference." Plaintiff has not formally moved to amend her complaint and, even if she had, she would need to do more than ask the Court to fix her caption.

This Court has been clear that a plaintiff that proceeds to summary judgment against a non-liable entity does so at her own peril. *See Padgett v. Norfolk S. R.R.*, 2021 WL 2434293 (N.D. Ind. June 15, 2021). Plaintiff ignored repeated warnings from Defendant that it was not her employer.

8

Having failed to amend her complaint in response, the Court is left with only one option. Defendant is entitled to summary judgment as a matter of law.

C.     *Plaintiff is not a Qualified Individual Under the ADA*

Even had Plaintiff sued the correct entity, summary judgment would still be entered. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)). Plaintiff's complaint focuses on LNL's alleged failure to accommodate. (ECF No. 5 at 5).

"No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that she was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Under the ADA, a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The employee must "pass a two-step test" to be a "qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'"

9

*Id*. "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id*. "[Courts] presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (*citing Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001)); *see also Feldman v. Olin Corp*., 692 F.3d 748, 755 (7th Cir. 2012) (courts must "generally defer to an employer's determination of the essential functions of a job"); *Lloyd v. Swifty Transp. Inc*., 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision."). Ultimately, "[t]he burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dep't of Corrs*., 107 F.3d 484, 484 (7th Cir. 1997).

In determining whether Plaintiff was a qualified individual, the Court must look to the position she held at the time of the adverse employment decision. *Hamm v. Exxon Oil Corp.*, 223 Fed. Appx. 506, 508 (7th Cir. 2007). Thus, Plaintiff must show that she could perform the position of Senior Servicing Representative with or without reasonable accommodation. Plaintiff does not argue she could perform that position without accommodation. Thus, the question before the Court is whether Plaintiff could perform the position with a reasonable accommodation.

At the outset, the parties dispute whether the headset/dictation software offered by LNL was a reasonable accommodation. The burden is on Plaintiff to show that LNL did not offer a reasonable accommodation. *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008); 42 U.S.C. § 12112(b)(5)(A). But an employer is not obligated to provide an employee the accommodation he requests or prefers, or even the most reasonable accommodation—the employer need only provide some reasonable accommodation. *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir.

1996), *see also Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). The ADA defines "reasonable accommodation" to include "job restructuring . . . reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations." 42 U.S.C. § 12111(9).

When evaluating the reasonableness of an offered accommodation, the Court must be mindful that reasonableness is "connected to what the employer knows about the specific limitations affecting an employee." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir.2005); see also 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); *see also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) ("By the statutory language, 'reasonable accommodation' is limited by the employer's knowledge of the disability.").

Plaintiff's entire case rests on Dr. Kintanar's opinion that she was "permanently disabled" from the Senior Servicing Representative position. Plaintiff, repeatedly, held up this opinion as the basis for her refusal to return to work. To wit:

> My doctor is not releasing me back to my current position. I will send the paperwork once I receive it from him.

(ECF No. 14-2 at 22).

> As you stated, my doctor totally disabled me from this position because of the repetitive use of the mouse and keyboard and he also indicated 'no overtime' which he has ordered for the past 4 years. You failed to mention that in your letter – refer to his letter dated June 28, 2018 which was hand-delivered to you on July 2, 2018. My doctor is aware of the volume and standards of this position and **I have not been released to go back to this position.**

(*Id*. at 38).

> The fact remains that I have **not** been released by my doctor to go back to this position and his Medical Documentation Forms are quite clear that I am permanently on disability from this position.

(*Id*. at 39).

> So, I will restate this again – my doctor has not released me to go back to this position – refer to the Medical Documentation Request Form – the accommodation is another position. So, if you cannot accommodate me then, I expect my Short Term disability benefits to be paid.
>
> I will **not** be back to work in this position on January 14, 2019 as that is **not** the accommodation.

(*Id*.).

Plaintiff is even more clear in her affidavit, submitted in opposition to Defendant's motion for summary judgment, that she could not perform the essential functions of the Senior Servicing Representative position regardless of accommodation.

> therapy continuously over July, August, and September of 2018. As there was no progression being made by me in physical therapy, Dr. Kintanar permanently disabled me from the new auditing position under Tony Walker effective September 26, 2018.

(ECF No. 24-2 at 7).

> Dr. Kintanar provided me with a return-to-work note dated September 25, 2018 with certain restrictions, but I was permanently disabled from my current position based upon doctor assessment and recommendations. This information was

(*Id*.).

> Lincoln's offer of accommodation by supplying a computer device was deficient and insincere considering that Ms. McDonald was no longer involved and that my doctor had totally disabled me from the position under Tony Walker. Ms. Jester's vague description and non-specific details indicated to me that the "computer device" accommodation was not even an effective solution -- there was no way I could perform a job that my doctor disabled me from by using a headset which did not live up to Ms. Jester's promises.

(*Id*. at 9).

> Ms. Jester mentioned a "ramp up" period, a term that I am familiar with as it applied to workers on the processing team. The term pertained to a period of time during which processors would build up their speed and accuracy. But the term never applied to the auditing team, because me and the other auditor, Rob Carney, had to audit all of the processed work that was done by a whole team, and do it by the end of the day, every day. The auditors could not leave until all of the money items that were processed that day were audited.

(*Id*. at 10).

> Ms. Jester then e-mailed me two links to two videos. These videos were from August and September of 2016 and were narrated by someone in Australia. I viewed the videos which demonstrated that the product was a voice-activated dictation system that worked with Microsoft Word and was used for dictating letters. THIS IS NOT WHAT MY JOB FUNCTION WAS AND WAS NOT THE THIRD-PARTY SYSTEMS I WAS USING. I DID NOT DICTATE LETTERS IN MICROSOFT WORD!

(*Id*. at 13).

13

> Jester also stated that I failed to return to work as required, but as I stated above, I never received any letter saying I was supposed to return to work. In fact, I notified Ms. Jester that Dr. Kintanar was not releasing me back to work for that position under Tony Walker.

(*Id*. at 14).

> Lincoln/Jester continued to push accommodations that were not proven or tested, and could not be considered effective reasonable accommodations (computer software that didn't even work with the third-party systems used at Lincoln). I had received different answers from Ms. Jester on the so-called accommodations and my concerns went unanswered. Furthermore, Jester/Lincoln kept demanding that I come back to a job that my doctor had not released me to go back to, all the while telling me that she (Jester) needed a doctor's release on multiple occasions. Lincoln never offered me any real accommodation that enabled me to perform the job.

(*Id*. at 16). Perhaps most damning, Plaintiff states, under oath, that "Lincoln's medical consultant agreed with my doctor that the position Ms. Jester tried to place me in (even with the so-called accommodation) ***was not possible***." (*Id*. at 17) (emphasis added). Plaintiff's evidence can be read only one way: she could not perform the Senior Servicing Representative position regardless of the proposed accommodation. Plaintiff's position dooms her ADA claim as she is not a "qualified individual" under the Act.

Rather than focus on her position, Plaintiff suggests that the appropriate accommodation was transfer to a new position. She identifies two such positions: the position she held before the reorganization and a "manager's position that does not require constant mouse or keyboard use."

14

(*Id*. at 15). There are legal issues with Plaintiff's argument, but a glaring factual issue takes precedence. Plaintiff's affidavit and brief re-imagine her medical restriction as one preventing her from "constant mouse and keyboard motions." (*Id*.). This, however, is not what Dr. Kintanar stated.

On September 25, 2018, Dr. Kintanar stated, "[Plaintiff] is not to use a keyboard and mouse." (ECF No. 14-2 at 18). On November 26, 2018, he stated that she could not "perform repetitive motions with her both [sic] hands ie [sic] current work situation." (*Id*. at 33). On March 11, 2019, Dr. Kintanar stated that Plaintiff was "unable to use repetitive motion involving hands wrists shoulders [sic]," that she was "unable to use a keyboard and mouse," that she required a position that "does not require use of keyboard or mouse." (*Id*. at 46–50). Finally, Dr. Kintanar stated that Plaintiff was "not able to" use a keyboard and mouse. (*Id*. at 43). Dr. Kintanar's opinion never wavered: Plaintiff could not use a keyboard or mouse.

Dr. Kintanar's actual restriction renders Plaintiff's proposed accommodations unavailable. Plaintiff does not claim that her previous position did not require the use of a keyboard or mouse, just that the keyboard and mouse were used less often. Plaintiff does not claim that the management position would not have required the use of a mouse or keyboard, only that the holder of the position is not in front of a computer all day. Indeed, Defendant has submitted evidence that there were no positions available that did not require the use of a keyboard and mouse, and Plaintiff has submitted nothing to dispute this fact. Dr. Kintanar effectively restricted Plaintiff from any employment at LNL, leaving transfer to a new position unavailable.

What the Court is left with is someone who, according to her doctor, could not perform any available position at LNL. She has not, and cannot, raise a triable issue of fact over her status as a qualified individual covered by the ADA — a requirement to proceed with her claims of

failure to accommodate. For this reason, the Court need not reach the merits of her failure to accommodate claims. *Arroyo v. Volvo Grp. N. Am., LLC*, 2019 WL 4749869, at *13 (N.D. Ill. Sept. 30, 2019); *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1028 (N.D. Ill. 2016) ("Because Plaintiff fails to establish that she is a qualified individual within the meaning of the ADA, the Court need not address the merits of her failure to accommodate claim."). Defendant's motion for summary judgment must be granted on the ADA failure to accommodate claim.

**D.**     ***Plaintiff was Responsible for a Breakdown in the Interactive Process***

The Plaintiff's claim also fails based upon her failure to engage in the interactive process. Once made aware of the need for accommodation, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). Rather, the employer has an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020) (quoting *Sears*, 417 F.3d at 807). Moving forward, "the employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available." *Sears*, 417 F.3d at 804. Each party must set forth a "'good faith effort' to determine what accommodations are necessary." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (quoting *Beck*, 75 F.3d at 1135). If the process breaks down, "courts should attempt to isolate the cause...and then assign responsibility." *Id*.

In this case, LNL offered the Plaintiff an accommodation to the restriction regarding the use of the keyboard and mouse. In response to the offered accommodation, the Plaintiff refused to even try the headset/dictation software, repeatedly asserting that the only accommodation she

would accept would be transfer to a position she could not perform and that was not available. Plaintiff's conduct cannot be described as a good faith effort to determine what accommodations are necessary.

When a plaintiff is the cause of a breakdown in the interactive process, she cannot prevail on her ADA claim. *Beck*, 75 F.3d at 1137. So it is here. Plaintiff's "my way or the highway" approach stunted the interactive process before it got off the ground. Plaintiff's failure to participate in the interactive process is yet another reason why summary judgment is appropriate.

**E.**     ***Plaintiff has not Designated Evidence of ADA Retaliation***

Separate from her ADA failure to accommodate claim, Plaintiff also claims that Defendant retaliated against her for requesting the accommodations. The ADA prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA, such as filing a Charge of Discrimination with the EEOC or requesting reasonable accommodations. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018). To establish a retaliation claim, Plaintiff "must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Id*. at 243. Fortunately for Plaintiff, she may pursue a retaliation claim "regardless of whether the initial claims of discrimination are meritless." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

This case, like most, turns on causation. To show that retaliation was the "but for" reason for her termination, Plaintiff can use either direct or circumstantial evidence. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). An admission that LNL fired Plaintiff in retaliation for her requests for accommodations would be direct evidence. *Id*. Such evidence is, of course, rare. More often, plaintiffs present circumstantial evidence of discrimination. Such evidence includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other

employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. at 504. In reviewing the designated evidence, the Court must keep in mind the sole question that matters: "Whether a reasonable juror could conclude that [the plaintiff] would have kept [her] job if [s]he [did not have the proscribed factor], and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc*., 834 F.3d 760, 764 (7th Cir. 2016).

Plaintiff has designated no evidence connecting her termination to her requests for accommodation. Her brief does little more than recite the same facts insufficient to show a failure to accommodate. (ECF No. 23 at 5). These facts do nothing more when used in the retaliation context. Instead, the facts show that Plaintiff was terminated over her failure to so much as try LNL's proposed accommodation and her continued insistence that she be placed in a job that was unavailable and that she could not perform. No reasonable jury could find that Plaintiff lost her job over ADA retaliation, mandating the entry of summary judgment.

F.   ***Plaintiff has not Designated Evidence of Disparate Treatment under the ADEA***

Finally, Plaintiff alleges that her transfer to the Senior Servicing Representative position was an adverse employment action in violation of the ADEA. A plaintiff seeking to recover for disparate treatment under the ADEA must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Financial Servs., Inc*., 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009); *Fleishman v. Continental Cas. Co*., 698 F.3d 598, 603 (7th Cir. 2012). In this respect, the ADEA is narrower than Title VII of the Civil Rights Act of 1964, as Title VII also protects against mixed-motive discrimination. *See Hossack v. Floor Covering Assocs. of Joliet, Inc*., 492 F.3d 853, 860 (7th Cir. 2007).

An ADEA plaintiff may proceed by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003), overruled in part on other grounds by *Ortiz*, 834 F.3d at 760. Alternatively, a plaintiff may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the burden-shifting approach, the plaintiff must come forward with evidence showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If the plaintiff has established this prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id*. (citation omitted). However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age. *See Ortiz*, 834 F.3d at 765 ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action. Evidence must be considered as a whole . . ..").

Assuming, without finding, that the transition to Senior Servicing Representative was an adverse employment action, Plaintiff has failed to show that it was caused by her age. The only evidence advanced by Plaintiff on this point is the fact that she was replaced by a younger worker. This, alone, is not enough to permit a reasonable jury to conclude that LNL acted for discriminatory

reasons. *See Fredericks v. Adventist La Grange Mem. Hosp.*, 2014 WL 64332, at *6 (N.D. Ill Jan. 8, 2014).

The undisputed facts show that Plaintiff's position was one of many that changed when her department was reorganized. This change included the addition of necessary skills that Plaintiff lacked; namely, working with pivot tables. Plaintiff was moved to a position that did not require this skill. This is not age discrimination; this is a non-pretextual reason to place an employee in a different job. No reasonable jury could find that Plaintiff suffered an adverse employment action because of her age, and summary judgment is appropriate.

### III. Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 13) is GRANTED. The Clerk is DIRECTED to enter judgment for Defendant and against Plaintiff.

SO ORDERED on November 30, 2021.

                                               s/ *Holly A. Brady*
                                               JUDGE HOLLY A. BRADY
                                               UNITED STATES DISTRICT COURT